## NORRIS v. UNITED STATES.

### DILLAGE v. SAME.

#### Nos. 9079, 9080.

Circuit Court of Appeals, Eighth Circuit.
April 17, 1931.
Rehearing Denied May 28, 1931.

Francis Murphy, of Fargo, N. D., and J. M. Hanley, of Mandan, N. D. (W. H. Shure, of Fargo, N. D., and John F. Sullivan, of Mandan, N. D., on the brief), for appellants.

Usher L. Burdick, Asst. U. S. Atty., of Fargo, N. D. (Peter B. Garberg, U. S. Atty., of Fargo, N. D., on the brief), for the United States.

Before VAN VALKENBURGH and BOOTH, Circuit Judges, and MUNGER, District Judge.

VAN VALKENBURGH, Circuit Judge.

Appellants were jointly indicted in the District Court of the United States for the

District of North Dakota for the unlawful transportation of whisky and alcohol. One Ed Madison was also named as an aider and abettor. The trial resulted in the conviction of appellants and a mistrial as to Madison. Norris was sentenced to pay a fine of $5,000 and to be imprisoned for a period of five years; Dillage, to two and one-half years' imprisonment, and to pay a fine of $2,500. Comprehensively stated, the facts are these:

Sunday, March 30, 1930, at about 9 o'clock in the morning, one L. C. Quinn, engaged in the storage business at Fargo, N. D., testified that he helped to load a quantity of liquor out of his warehouse into a truck, described as a Reo truck. A man by the name of Arthur Barenson was with the truck. The circumstances concerning the loading are thus stated by this witness:

"Q. And what did you load into the truck at that time? A. Well, it was supposed to have been a load of—

"Q. Just tell physically what you put in there? A. I think it was twenty kegs, and some packages.

"Q. Do you know what was in the packages? A. I could not swear to it.

"Q. What kind of packages? A. It was packages about that square (indicating) tied up and done up in paper.

"Q. Did it sound like liquid in the packages? A. Well, I know they was filled up; I could not swear to what they sounded like.

"Q. Well, did it sound like water or sound like cement? A. Well, it sounded like water.

"Q. And how many of those packages did you put in the truck? A. I cannot swear to just the exact amount now.

"Q. At the time that you assisted in loading this truck did you know what was in those packages? A. No, sir.

"Q. And what part did Barenson, this gentleman over here, what part did he take in loading the truck? A. Just stayed on the truck.

"Q. How long did it take you to load it? A. About twenty minutes.

"Q. About what time did the truck leave your warehouse? A. Shortly after nine.

"Q. In the morning? A. In the morning.

"Q. Did you know whether or not these packages contained tin containers? A. They were tin containers.

"Q. About how many tins per package? A. Three in a package.

"Q. Then how many packages did you put in the truck? A. I could not swear to the exact amount but there was somewhere around thirty or forty packages.

"Q. What was the capacity of each of those tins of three? A. I imagine there was a gallon can.

"Q. That is your best judgment? A. Yes, sir.

"Q. And what was the capacity of the kegs? A. Ten gallon kegs.

"Q. And how many of those did you say there were? A. Twenty if I remember correctly.

"Q. And what kind of kegs were they? A. Wood kegs.

"Q. Ten gallon wood kegs; could you tell whether or not the contents of the kegs were liquid or solid? A. They were liquid.

"Q. Did they have any odor about them? A. Not that I could swear to.

"Q. Or the cans either? A. Not that I could swear to.

"Q. You have seen gallon cans that contained alcohol have you not? A. Yes, sir.

"Q. And were those cans that were packed three each in packages similar to the gallon cans that you know contain alcohol? A. Yes, sir.

"Mr. Murphy: No cross-examination."

Later, in the forenoon of March 30, 1930, a Reo truck, heavily loaded was seen standing in the vicinity of Thirteenth street and Third Avenue North in Fargo by a number of witnesses. This truck is variously described as a "Reo truck" or "Reo Speed Wagon," with a "grain box" on it of a green or greenish color. At one time Barenson was seen by several witnesses standing a short distance from this truck. While the truck was standing there, a boy named Arthur Olson climbed upon it and took therefrom one of the gallon cans with which it was loaded. His brother Leonard Olson "sampled it," as he says, by tasting, and found it contained alcohol. Another witness, Gordon Baird, smelled it and pronounced it alcohol. Subsequently this can found its way into the hands of a chemist, who testified that it had an alcoholic content of 93 per cent. Shortly after this can had been taken from the truck by Arthur Olson, three men drove up in a Buick car, alighted, and walked over to the truck. They were identified as Barenson, Norris, and Dillage. One of the men put a satchel in the cab of the truck and then entered it himself. Barenson and Dillage returned to the Buick. The truck immediately pulled out toward the west. The hour of its departure was about

12 o'clock, noon. Dillage and Barenson in the Buick car followed the truck at a distance of from 50 to 75 feet. About seven or eight blocks farther on, the truck was stopped by the defendant Madison, chief of police. In about ten minutes it was permitted to proceed. Two witnesses followed it and the Buick car westward for a distance of five and one-half miles.

Edward Akason, thirteen years old, who lives on a farm eight miles west of Fargo, testified that "around noon," on Sunday, March 30, 1930, a truck resembling a Reo, and having a green grain box on it, arrived at his home. A man came to the door of the barn, where witness and others were, called his brother out and talked to him. He says: "They went out and they shut the barn door again and I did not see the truck after that, and I noticed the granary doors were shut so I took it for granted they had the truck in the granary." The man in question was identified as appellant Norris.

"Q. Now what time of night did the truck leave there? A. Oh, I should judge about seven or eight o'clock.

"Q. During the day what did this man do around the farm? A. Well, he had a little bit to eat with us at dinner and then he went in the other room and read the papers for a while and then went up stairs and laid down and about dark he come down and had supper with us."

Arthur Barenson was called as a witness by the government. We quote a portion of his testimony:

"Direct Examination

"By Mr. Thorp: Q. What is your name? A. Arthur Barenson.

"Q. Where do you live? A. Fargo.

"Q. Fargo? A. Yes, sir.

"Q. How long have you lived in Fargo? A. Close to two years.

"Q. Where were you living on the 30th day of March, 1930? A. At Fargo.

"Q. Do you have any business in Fargo? A. Yes, sir.

"Q. What is it? A. I was working for Lehigh Briquetting Company.

"Q. Where were you on the 30th of March, what town? A. I think I was at Fargo.

"Q. Do you know Lee Dillage? A. I refuse to answer on the grounds of incriminating myself; I have a case pending now.

"Q. You have already pleaded guilty in the State Court to the charge of being in possession of intoxicating liquor? A. I have.

"Q. And you are now under service for that offense? A. I am in the custody of the Sheriff.

"Q. That was on account of certain liquor that was in the Fargo Storage Company's place? A. I could not say as to that.

"Q. Well, it was on account of some liquor that you had on the 30th of March? A. I could not say as to that either.

"Q. Did you have possession of more than one bunch of liquor? A. I could not say as to that.

"Mr. Murphy: Are you now referring to the offense to which you claim he pleaded guilty?

"Mr. Thorp: Yes, sir.

"Q. What liquor did you understand that you were pleading guilty to as having had possession of? A. At the warehouse.

"Q. What warehouse? A. Fargo Transfer and Storage Company.

"Q. And that liquor consisted of alcohol and some moonshine, didn't it? A. Yes.

"Q. And the alcohol was in tin cans? A. Yes, sir.

"Q. And the moonshine was in kegs? A. Yes, sir.

"Q. And it was there in that warehouse on the morning of March 30, 1930? A. I could not say.

"Q. Well, it was there the day before, wasn't it? A. I could not say.

"Q. Were you at the warehouse where that liquor was on the morning of March 30, 1930? A. I cannot answer that.

"Q. What? A. I refuse to answer on the grounds of incriminating myself."

The assigned errors upon which both appellants rely are:

(1) The failure of the court to instruct the jury to return a verdict of acquittal because of the insufficiency of the evidence.

(2) The admission of Government's Exhibit 1 and contents.

(3) Denying appellants' motion to strike out the testimony of the witness Quinn.

(4) Admission of the testimony of witness Walter Olson as to conversations with the defendant Madison not in the presence of appellants; refusal to strike such testimony, and failure to advise the jury as to its limitations.

(5) Failure to order a mistrial because of injury to a juror during the trial.

(6) The invalidity of the Jones Law, and, in that connection, the insufficiency of the indictment.

We shall take up these specifications in their order.

■ 1. We think there was substantial evidence to support the verdict and judgment against appellant Norris. With respect to appellant Dillage, it fails to rise sufficiently above the plane of mere suspicion to warrant affirmance as to him. We shall discuss the remaining specifications in the light of these conclusions.

■ 2. Government's Exhibit 1 was the can of alcohol which Arthur Olson took from the truck while it was standing on Third avenue near Thirteenth street in Fargo on the 30th of March, 1930. Without dwelling upon the details of the transaction, we think the evidence warranted the court in admitting this exhibit for the consideration of the jury. Apart from the testimony of the chemist, by whom the contents of the can were analyzed, there was substantial direct testimony that the can contained alcohol.

■ 3. Because of the obvious relationship of Barenson with the transaction, the connection between the loading of the truck at Quinn's warehouse and its subsequent transportation by appellant Norris was sufficiently established to make the testimony of Quinn competent. The objection to the admission of that testimony and the motion to strike it out were properly overruled.

■ 4. Walter Olson was a police officer who accompanied the chief, defendant Madison, at the time the truck was stopped and afterwards permitted to proceed. Over the objection of counsel for appellants, he was permitted to testify to a conversation between himself and Madison as they were returning to the city. That conversation concerned Barenson, and did not mention appellants directly nor indirectly. Upon objection to the testimony as incompetent to bind either appellant, the court said: "That would not make it incompetent as to the chief." Mr. Murphy (for appellants): "Possibly not as to the chief." Finally the court said: "I assume that the answer is at the present time merely for the purpose of what Madison said. Objection overruled, and the court will later on if counsel requests caution the jury, if necessary, as to the other two defendants." The testimony was negligible as to its effect upon appellants in any view, and was doubtless so considered by counsel for appellants, for they made no request for an instruction

as invited by the court, nor did they except to the charge as given. This specification is without merit.

■ 5. One of the jurors was struck by an automobile and injured slightly before the deliberations of the jury were concluded. His examination disclosed that the accident was not sufficiently serious to interfere with his ability properly to discharge his duty as a juror in the case. Counsel for appellants complain of the failure of the court to order a mistrial because of this accident. No motion to that effect was made by the defense. The juror was not shown to be incapacitated, and the court committed no error in permitting the deliberations of the jury to proceed to verdict.

■ 6. The Jones Act (Act March 2, 1929 [27 USCA §§ 91, 92]) is attacked as unconstitutional and void as an improper delegation of legislative power. It is further urged that it is so indefinite, ambiguous, and uncertain as to be unenforceable. These questions are no longer open ones. It has been authoritatively ruled to the contrary. Ross v. United States (C. C. A. 4) 37 F.(2d) 557; McElvogue v. United States (C. C. A. 8) 40 F.(2d) 889. In both cases certiorari was denied. 281 U. S. 767, 50 S. Ct. 466, 74 L. Ed. 1175, and 282 U. S. 845, 51 S. Ct. 24, 75 L. Ed. ——, October 13, 1930. See, also, Husty et al. v. United States, 282 U. S. 694, 51 S. Ct. 240, 242, 75 L. Ed. ——, February 24, 1931.

This indictment is attacked as insufficient because it does not state whether the accused are charged with "casual" or "slight" violation of the law, or whether they are charged with "habitual sales," or with "attempts to commercialize violations of the law." This criticism is met in the cases cited above. In Husty et al. v. United States, supra, the Supreme Court said:

"As the act added no new criminal offense to those enumerated and defined in the National Prohibition Act, it added nothing to the material allegations required to be set out in indictments for those offenses. The proviso is only a guide to the discretion of the court in imposing the increased sentences for those offenses for which an increased penalty is authorized by the act"—citing Ross v. United States and McElvogue v. United States, supra.

■ Finally, it is urged that the court abused this discretion in the sentence imposed. It is submitted that the record does not justify an increase of sentence over that

provided for transportation in the National Prohibition Act (27 USCA § 46). As suggested in the Husty Case, the District Court may have had before it facts other than those appearing of record which it was entitled to consider in imposing sentence under the Jones Act." North Dakota is situated on the Canadian border. It is a matter of common knowledge that much of the illicit supply of intoxicating liquor which finds its way into sections of the United States is smuggled from Canada. The offense here charged involved transportation on a large scale. The record furnishes support for the conclusion that appellant Norris was operating along the line of an established route or "underground railway" in furtherance of this unlawful importation. At all events, we cannot say that the District Court exceeded its powers in the premises. It results that the judgment in case No. 9079 is affirmed; that in No. 9080 is reversed, and the case is remanded for a new trial.